UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
MARK LEIBOWITZ,

                    Plaintiff,

              -against-

ATERNITY, INC., and TREVOR MATZ,

                  Defendants.
--------------------------------------------------------x

**MEMORANDUM OF
<u>DECISION AND ORDER</u>**

10 CV 2289 (ADS)

**APPEARANCES:**

    **SPEYER & PERLBERG, LLP**
    Attorneys for the Plaintiff
    115 Broadhollow Road, Suite 250
    Melville, NY 11747
    By:    Dennis M. Perlberg, Esq.
            Ira Leibowitz, Esq.
            Thomas E. Scott, Esq. and
            Gina M. Fortunato, Esq.
            Of Counsel

    **SIMON LESSER, PC**
    Attorneys for the Defendants
    420 Lexington Avenue
    New York, NY  10170
    By:    Leonard F. Lesser, Esq.
            Of Counsel

    **NYSTROM BECKMAN & PARIS, LLP**
    Of Counsel Firm for the Defendants
    10 St. James Avenue, 16th Floor
    Boston, MA 02116
    By:    Michael Paris, Esq., and
            Dana Zakarian, Esq.
            Of Counsel

**SPATT, District Judge.**

This is a case of an important sales employee, in a startup rising software company, under strict legal obligations with regard to trade secrets and confidential information, being terminated and immediately begins working for his prior employer's principal competitor.

Before the Court is a motion by the defendant and counterclaim plaintiff Aternity, Inc. ("Aternity") for a preliminary injunction to enjoin its former Regional Sales Manager, the plaintiff and counterclaim defendant Mark Leibowitz from: (1) "working for Aternity's principal competitor KNOA Software, Inc. ("KNOA") for a period of one year, namely May 14, 2010 through May 14, 2011"; (2) soliciting any business from any existing or prospective customer of Aternity that is competitive with any service or product offered or under development by Aternity for that one year period; (3) using or disclosing any Confidential Information as defined in paragraph 3 of the Agreement; (4) using or disclosing Aternity Trade Secrets; and (5) disparaging Aternity and its officers, directors, shareholders and employees.

The Court held a hearing on this application for a preliminary injunction on June 22, 2010, June 28, 2010 and June 30, 2010. Upon a review of the hearing and the law, for the reasons set forth below, the Court grants the defendant's motion for a preliminary injunction to the extent and in the terms as stated in this opinion.

## I. THE HEARING

Initially, an explanation of the business of Aternity is in order and is a necessary foundation for the Court's finding. In the Aternity memorandum of law in support of its motion for a preliminary injunction, there is an explanation of the business of Aternity, which, the Court finds, is supported by the testimony at the hearing.

Aternity is an Information Technology ("IT") company that develops IT management solutions. Aternity's software products enable the IT department in large companies to automatically monitor the computers of its employees in order to detect and correct potential problems before they occur. These software products prevent computer crashes and disruptions that can cost the company many millions of dollars. Aternity's products are designed to transform every desktop computer into a self-monitoring platform. These software products are designed to substantially reduce business disruptions and to increase user productivity. Aternity markets its software to Global 1000 and Fortune 500 companies by its sales and marketing staff and large network of contacts. As to compensation, the Court is further advised that typical sales contracts with these large corporate customers range from $250,000 to more than $1 million.

## A.  Aternity's Case in Support of the Motion for a Preliminary Injunction

Donna Parent is the Vice President of Marketing for Aternity. Aternity is a relatively new software company in the field described above. Her job is to develop a marketing campaign for the company. Parent had worked for four other companies prior to her employment at Aternity. Her specialty was working with new software companies. Aternity customized the software for each account. Aternity monitors their customer's computer system to identify problems. The Aternity fee is from $250,000 to more than one million dollars. Aternity furnished customized service for each customer, taking six to nine months to design a product for the customer's computer system.

Parent described the somewhat complicated process of working with a prospective customer. During this time, the Aternity personnel work closely with the customer in an ongoing collaborative process. These campaigns cost Aternity substantial funds; more than $400,000 plus

$10,000 to $15,000 per event.  She described their work as a "unique marketing campaign."  Apparently, customers for this type of highly specialized and very expensive procedures are rare.  Parent described qualified prospects as "needles in a hay stack."  At some point in the process, the customer enters into a non-disclosure agreement with Aternity.

Parent testified as to the trade secrets involved in the Aternity processes.  She described their work as "extremely confidential."  Among the trade secrets she described were (1) their price lists and calculations leading to the prices, which if known would give a competitor an upper hand; (2) e-mails referring to Aternity weaknesses, which, in the hands of their chief competitor KNOA, would give it a great advantage in making a particular sale; (3) the "MIND SHARE," which is related to Aternity's business needs; (4) the "Sales Force Lead Generation Report," which is a specific report that points out the "needles in the haystack," or potential customers – great leads for a competitor, which lists are very confidential, cannot be purchased or acquired by competitors and would take "years" for a competitor such as KNOA to create; and (5) the "Strategic Marketing Messaging Document," which is the Aternity playbook for sales and marketing, a confidential document with sales techniques and information regarding potential customers.  Parent further explained that with the expensive process Aternity deals with, pricing often becomes the ultimate factor in a sale.  In addition, Parent testified that there are many other Aternity trade secrets in this highly specialized software redemption business.

Parent also described Aternity's efforts to protect the confidentiality of its trade secrets.  This is a major objective in the company's business.  In this regard, each employee must sign a confidentiality agreement.  Also, among other protections, there is a password protected data base called The Globe, that only Aternity employees can access.

The plaintiff Mark Leibowitz signed a non-disclosure agreement, which is in evidence as the defendants' Exhibit A. This agreement is detailed and extensive. It includes many paragraphs relating to Aternity trade secrets and confidential information and the obligation of the employee not to reveal this confidential information. There is no doubt that the plaintiff had full access to the confidential information and trade secrets of Aternity.

Parent testified that KNOA was the primary competitor in the End User Experience ("EUE"). Aternity had already gone head to head with KNOA in the Black & Decker customer rivalry. At quarterly sales meetings, Aternity personnel discussed their primary competitor, and what must be done to outsell KNOA. In the Aternity 2009 review (Defendant's Ex. D), a major tool in the Aternity business life, the second page in this Aternity road map is devoted to Product Competition by KNOA. The page reads as follows:

## Product Competition

- KNOA

- They are watching us closely and emulating our messages and product features

- We need to continue to widen the gap so they can NOT catch up

- We need to continue to OUT SELL them at EVERY opportunity

- We can NOT let them get a foothold into ANY of our verticals

- Our Core Focus Areas are our Differentiators!!

- Be Vigilant, Be Paranoid, Be the Best!

At the 2009 Product Review session, the plaintiff was present when Parent and CEO Trevor Matz presented a personal slide review including a discussion of their major competition, KNOA. In addition, the plaintiff acknowledged that he was able to access The Globe, which contained Aternity confidential information.

Parent learned in mid-April 2010, that the plaintiff was terminated from employment with Aternity. Significantly, in a review of his e-mail files, she learned that the plaintiff, by e-mails, did send himself a number of confidential documents not available in the public domain. Apparently, he sent these confidential documents to himself in his personal e-mail account after he learned that he was no longer to be employed by Aternity. Included in these confidential documents were trade secrets including a number of pricing records sent to companies that Aternity was endeavoring to sell and a 2010 pricing calculator containing confidential trade secret information. Parent testified that this material was never shared with anyone outside the company and was stored in the company's protected data. The record includes repeated e-mails from Leibowitz to himself in which he receives a number of confidential Aternity records including trade secrets. These include the Aternity Pricing Calculator; the Proof of Concept, which provide software data to clients and is shared only with prospects; an Aternity signed Contract Form; an Aternity License Agreement; an Aternity Revenue Plan Discussion; and a list of potential major customers, with dates of appearances. In addition, Leibowitz e-mailed to himself in late February 2010, the lists of qualified prospects of Aternity, including the "needles in a haystack" prospective customers (Defendant's Ex. G).

Q. Did Aternity consider Exhibit G to be proprietary and confidential information?

A.      Yes.

Q.      Why is that?

A.      Because these are the results of the time, effort and money from doing a number of outreach marketing programs to get to a subset of prospects, qualified prospects, who are interested in receiving a demonstration of Aternity, and they also include the people who actually received that demonstration.

Q.      Was this information shared outside of Aternity?

A.      No.

Q.      Were measures kept to keep it confidential?

A.      Yes.

Q.      Is this something that Mr. Leibowitz could have accessed on the Globe?

A.      No, these lists are not available on the Globe.  What he could have accessed was his web-based e-mail account to see this e-mail.

Q.      When Mr. Leibowitz left the company, did he, to your knowledge, return this information?

A.      Not to my knowledge.

Q.      Would this information be useful to an employee who left the company and had it in his or her possession?

        MR. PERLBERG:      Objection.

        THE COURT:         Overruled.

A.    Absolutely.

Again, these lists contain those qualified prospects or those
needles in the haystack that we've taken a lot of time to nurture and
to get them to a point to be interested in an end-user experience
and to receive a demonstration of Aternity.

A list like this in our competitor's hands gives them the
benefit of not having to do all the work that has done into creating
the campaigns and finding these prospects. They would get a jump
start on being able to build campaigns that would go after these
prospects with their own software.

(Tr. at 69-71).[*]

Parent described the contents of another e-mail Leibowitz sent to himself, two days
before his official termination:

From:         Mark Leibowitz [Mark.Leibowitz@aternity.com]

Sent:         Friday, April 09, 2010 8:51 AM

To:           'markl2@optonline.net'

Subject:      FQ: Q2 Revenue Plan Discussion

Attachments:  Bank of America Schedule A6 for Merrill Lynch (March 15 2010).docx; Proposal
              for Cigna - USD (March 19 2010).pdf; 2010 Aternity Pricing Calculator - Cigna
              (March 19 2010).xls; Proposal for Paychex - USD (Feb 23 2010).pdf; Aternity
              Pricing Calculator for Paychex (Feb 23 2010).xls; 2010 Aternity Pricing
              Calculator - Sidley Austin LLP-1600 (Jan 26 2010).xls; 2010 Aternity Pricing
              Calculator - Sidley Austin LLP-3200 (Jan 26 2010).xls; Proposal For Sidley
              Austin LLP (Jan 26 2010).pdf

---

[*]Tr. refers to the hearing transcripts.

Significantly, Leibowitz did not return any of these highly confidential documents to Aternity, after his termination. Parent described the potential danger to Aternity if the plaintiff was permitted to work at KNOA, as "devastating" and could crush the company.

Q. Ms. Parent, just to wind down, would you describe for the Court, in your view, the harm that Aternity would suffer if Mr. Leibowitz is permitted to work at Knoa?

MR. PERLBERG:     Objection.

THE COURT:        Overruled.

A. The harm would be devastating to the company.

I've been in marketing for a good number of years now. I spent a lot of time at start-up enterprise software companies, and at every company I've been at, including Aternity, it's very difficult to not have information spread throughout the organization because we are so small. And being a small company means that we all understand that you need to sign NDAs in order to protect the leakage of that organization outside of the company.

We're at a critical time for the company, and having our proprietary and confidential information shared, especially to a competitor like Knoa, could absolutely crush the company.

Everything that I've talked about, from the pricing list to the strategic messaging document to the sales list that show those

needles in the haystack, those people I've personally taken hours

and weeks and even years to find, to give to our sales organization,

is just simply not fair for someone to be able to give this

information to a competitor and give them such a competitive

edge.

      Because right now, where the end-user experience industry

is at, any competitive edge is so huge - - and like I said, it would

absolutely devastate a company of our size where, every day, all of

our employees are working and struggling very hard to not only

maintain our competitive edge but to also protect our confidential

information and to make sure we're doing all we can to continue to

be an industry leader.

(Tr. at 71, 72).

      On cross-examination, Parent conceded that there was no Aternity rule that employees

can't e-mail documents from the Globe to their personal computers.  She said that although there

was no specific rule, it was understood.  Also, she stated that Leibowitz had some prior

relationships with financial companies and brought "some of his business into the company."

(Tr. at 95).  However, Parent testified that Leibowitz brought in no revenue producing customers.

In fact there was no customer or relationship from Leibowitz that purchased the EUE Aternity

software.  Also, the plaintiff worked at home for the company and was furnished with a small

computer for that purpose.

      Parent was questioned about the key term EUE, meaning End-User Experience.

According to Parent, this term "is a subcategory of application performance management."

Parent further explained the term:

> THE COURT:          Now, you used some initials:  EUE.
>
> THE WITNESS:       That's the acronym.
>
> THE COURT:          What does that stand for?
>
> THE WITNESS:       End-user experience.
>
> THE COURT:          End-user experience.
>
> What does that mean?
>
> THE WITNESS:       So that goes back to the overarching industry is application performance management.  End-user experience, for instance - - maybe if I provide an example, that might be more relevant.
>
> You are using your computer, and an application starts to go down.  It starts to crash on you.  Aternity, or end-user experience, provides the ability for the IT organization to proactively identify application issues before they impact the end-user.
>
> So before your e-mail starts to crash and you can't get into the system, Aternity gives them that information so as not to disrupt the business user.

(Tr. at 107, 108).

Parent testified that Aternity went head to head with KNOA to do work for the following

companies:  EMC, Black & Decker, AT&T, and Starwood.  (Tr. at 108).  Some of the Aternity

documents actually are stamped or marked "Notice of Confidentiality".  For example, the

Aternity price lists are so marked.  In addition, the Playbook, pages 13 through 21, entitled

"Industry Specific Key Messages," outlines the messages that Aternity is preparing to build

marketing campaigns for specific industries – used "to craft our marketing campaign to gain

mind share."  (Tr. at 126).

Parent concluded her testimony by attempting to explain the danger to Aternity if

Leibowitz revealed the confidential information and trade secrets currently in his possession.

Q.      What is messaging, please?

A.      Messaging in a young start-up company is the way we speak to particular

stakeholders in a way that will get them to understand the business value

that we can provide to their organization.  So it is the road map.  It's the

game plan that this document presents in sum that would really give our

competitor precise information on how to go after those industries as well.

What we're saying to these industries, what our campaigns could look like.

That, in combination with the price list, they could

undermine our pricing.  That, in combination with having access to

our lead generation report that we spoke about earlier, they can

pinpoint and target those people we spent weeks and months and

even years cultivating to find those needles in a haystack, to find

those end users' experience.

It would be devastating to have a document with this level

of detail, the messaging detail around marketing, messaging detail

around sales and messaging detail around the product, that could

absolutely devastate the company.

BY MR. PARIS:

Q.    And how would a competitor use this messaging information in a

detrimental way?  In other words, if you had the messaging information of

Knoa, how could you use that in a way that would cause harm, serious

harm, to Knoa?

A.    I could go out and I could construct campaigns, marketing campaigns, that

counter their messages.  I could go after areas where I believe could be

weak and be able to show how we are stronger than they are.

So I develop campaigns that would target specific

industries that would be able to entice my share away from

Aternity.

(Tr. at 131, 132).

Trevor Matz has been the President and CEO of Aternity since the end of May 2007.

Previously, he held many management positions with high technology companies.  Matz signed a

Non-Disclosure Agreement when he became the CEO.  A young company, Aternity sold five

customers by the end of 2007.  The plaintiff reported directly to him.  He testified that there was

no reason for Leibowitz to be e-mailing the Chase Licensing Agreement in March 2010 when

Chase became a customer in 2008.  Matz prepared the Aternity 2009 Review which was a

Power-Point presentation to share with their employees as to who were the company's primary

competitors.  This information was presented at a meeting at which the plaintiff was present.  At

this meeting, Matz told the company "that we have one primary competitor and that competitor is

KNOA."  (Tr. at 137).  He further stated that KNOA was "the only company that represents a

huge competitor threat to Aternity's success and survival."  (Tr. at 137).  Matz also testified that

"there are really only two remaining end-user experience companies in the market today and that

is KNOA and Aternity, and we fight head to head all the time. . . This is a two horse race

between Aternity and KNOA."  (Tr. at 137-138).  Matz further described their apprehensions

about KNOA:

> A.    We would speak about them in our quarterly meetings.  We would speak
>
> about them when they were in competitive situations that arose.  We
>
> would speak about them in the analyst community.
>
> We are and am constantly monitoring Knoa's evolution in
>
> the markets, their success, their press releases, what they are
>
> saying.  We were constantly being aware of what they were doing.

(Tr. at 138, 139).

Leibowitz well understood this intense competition between Aternity and KNOA.  On

April 11, 2008, Leibowitz sent Matz an e-mail.  The subject was "KNOA Update", as follows:

From:        Mark Leibowitz
Sent:        Friday, April 11, 2008  12:15 PM
To:          Trevor Matz
Subject:     KNOA Update

Hello, Trevor,

I got some very good G2 on KNOA this morning from a friend of mine who worked with me at
GT Software who joined KNOA last week.  They are in the process of hiring 6 direct salesman, 4

for direct sales and 2 for Channels. They just hired a former colleague of mine Marvel Gentle Davis who is based in Ohio. The internal talk is that they know we have a good product but they believe they are slightly ahead of us with their technology and want to do everything possible to keep that lead.

All of the hires are new. They have not been actively selling last year but the big push with them will start coming now. <u>I did not give any information that could be used against us. They are going to start going after the financial vertical as of next month.</u> Marvel does not know much as she just joined but I wanted to give you an update on KNOA. They have been heavily focused on SAP but going forward that strategy will be changing. They want to be application agnostic.

I hope this helps.

Regards,

Mark Leibowitz
Sales Manager, Financial Services
Aternity Inc.

(Dfts' Ex. J). (emphasis supplied).

    At 12:57 PM that same day, April 11, 2008, Matz responded to the plaintiff, as follows:

| | |
|---|---|
| From: | Trevor Matz |
| Sent: | Friday, April 11, 2008   12:54 PM |
| To: | Mark Leibowitz |
| Cc: | Raviv Chalamish; Donna Parent; Eden Shochat; Orit Kislev; Marcus Brown |
| Subject: | Re: KNOA Update |

Great intel. Thanks Mark.

1. <u>KNOA is definitely the competition to watch.</u>
2. We monitor every press release they issue, all press coverage they get as well their website (product related material) on a monthly basis (written reports).
3. They were placed highest in the Forester Wave in Sept/Oct last year.
4. They, together with Primatech and Serden, were our competition for the Gartner Cool Vendor report. We won!
5. They are about a year ahead of us in terms of sales activities, but do not have too much to show for their efforts yet. Their big wins included a major sale to BT around Siebel last year which resulted in their Forester positioning.
6. We have marketed directly to almost every company (20-40 per company), including BT, that they have on their website.
7. They have been successful around Siebel and have currently signed a reseller

agreement with SAP.  In this area they are WAY ahead of us.

8.    They are definitely not ahead of us from a technology perspective:
   a. They do not have an analytic engine, at least at the moment.
   b. They are not application agnostic, at least at the moment.
   c. They do not support Citrix like we do, at least at the moment.
   d. They do not support desktop monitoring, at least at the moment.
   e. Wanting be application agnostic and being application agnostic is VERY different.
   f. Carefully review the Comp Analysis I last sent you around KNOA for Hartford (similar to what I sent for TROWE).

9.    <u>I am SURE that they are monitoring us closely and will be/are working on filling the gaps aggressively.</u>

10.    We need to watch them closely and keep pushing ahead AGGRESSIVELY on all fronts.

11.    <u>They are definitely our #1 competitor in terms of addressing the same market space we address.</u>

12.    We need to make sure that do NOT forge the strategic relationships with the Partners we want to forge partnerships with, before we do.

13.    We are doubling our sales force from Monday with Marcus ;)!

14.    Competition is good, as long as we win!

Thanks.

(Dfts' Ex. J).  (emphasis supplied).

The purpose of these e-mails is clear.  It was to warn Leibowitz and other sales persons that "KNOA is definitely the competitor to watch" and "they are definitely our #1 competitor in terms of addressing the same market space we address."

Matz testified that Leibowitz had major performance and/or behavioral problems many times during his employment.  He stated that these problems started in 2007, and continued through 2008.  Leibowitz had major behavioral issues in early 2009, which resulted in the company putting him on probation.  Leibowitz continued to have behavioral issues throughout 2009 which resulted in the company putting him back on probation.  For example, in an e-mail, dated July 29, 2009, from Jeanne O'Byrne, the Aternity Vice President of Operations, the

plaintiff was chastized for inappropriate conduct during a "war story meeting" including an assertion that he made himself look like a "jerk". (Pltf's Ex. 26). He also had behavioral issues in the first quarter of 2010. In sum, on this subject, Matz testified that Leibowitz had behavioral and performance issues throughout his tenure. In early 2010, Matz had conversations with Leibowitz in which he advised him if he didn't change he would be terminated. Leibowitz was warned about this problem at every quarterly review. These warnings took place prior to the dates the plaintiff decided to e-mail confidential information and trade secrets to his home.

Matz was asked to describe the consequences if Leibowitz was permitted to work for KNOA.

Q.    Lastly, Mr. Matz, if Mr. Leibowitz is permitted to work for Knoa, could you describe the harm that Aternity would suffer as a consequence?

A.    Sure. In early stage start-up companies like Aternity, we fight every day for survival and our market leadership. Both our survival and our market leadership depend on the competitive advantage we have in the market over our competition.

Knoa is our number one primary and principal competitor.

Having our proprietary and confidential information, such as our prices, our qualified lists, the weaknesses of our product, the customer issues that we have faced, in the hands of our primary competitor would be devastating to the company.

(Tr. at 146).

17

On December 2, 2009, Matz sent an e-mail to Leibowitz and others in the company. The substance of this communication was that two separate analyst services indicated that KNOA was not faring so well. Matz spoke to a leading Forester analyst who said that the EUE market is a two horse race with Aternity and KNOA and that KNOA is in trouble and they seemed confused as to where to go from here. The e-mail then proceeded to set forth statistics between the two organizations. The Court notes that this e-mail regarding KNOA contains the following direction in capital letters: PLEASE DO NOT FORWARD THIS EMAIL TO ANYONE AND DO NOT QUOTE ANY OF THE ABOVE TO ANYONE OUTSIDE THE COMPANY. Matz testified that this was an unusual statement not normally found on the Aternity documents. Leibowitz responded to this communication from Matz 45 minutes later. In his e-mail on December 2, 2009, marked CONFIDENTIAL, he stated, in part:

> "I would recommend a campaign targeting their customers offering them a deep discount for switching to Aternity."

(Defendants' Ex. K).

On cross-examination, Matz was questioned closely with regard to the plaintiff's commissions. His commission rate during his first year was 10%. In approximately one year his commission rate was reduced to 5%. Matz explained that this was standard procedure at Aternity, and "that every year their board of directors set their business plan including the commission rates of the sales persons." He further explained that the initial 10% commission was for one year only, as set forth in the original offer letter in evidence. (See Pltf's Ex. 1). In the second year, 2008, his salary was increased from $100,000 to $125,000, and his commissions were reduced from 10% to 5% based on industry standard and practice. These changes were

accepted by Leibowitz in writing. The plaintiff's commission rate was further reduced in 2009 and 2010; each year in writing and accepted by the plaintiff, also in writing.

The plaintiff's performance was reviewed in a document entitled "Mark Leibowitz Q3 Review," dated October 1, 2009. (Pltf's Ex. 6). In this document, the plaintiff was told that he was no longer on probation; he was reminded again that he was an employee at will; he was told that he had not met his quota in 2008 or 2009; he was complimented for bringing in Wachovia and Chase. The document also discussed Leibowitz's view that his commission rate was unfair.

Matz identified one account where Leibowitz was directly negotiating against KNOA in the financial services market for the Bank of America account. In evidence is a document entitled "Aternity Competitive Landscape Overview" containing a list of competitive companies including KNOA. (Pltf's Ex. 7). After reviewing this document, and the companies listed, Matz again opined: "that leaves only KNOA as a primary competitor in the end-user experience market places." (Tr. at 188). It was brought out on cross-examination that Matz signed an affidavit on May 25, 2010, stating that if Leibowitz joined KNOA the harm to Aternity would be "cataclysmic and inoperable," because: "Knoa would have an intimate understanding of Aternity's pricing schedules, business models, sales methodologies and strategies in competitive and comparative positions, and could leverage that information to outsell Aternity." (Tr. at 189).

On April 16, 2010, the plaintiff was given a letter of termination, providing him with four weeks notice, with a final termination date of May 14, 2010. (Pltf's Ex. 22). He was offered a choice of the usual termination or a mutual separation agreement. He apparently chose the usual termination. In any event, after he received this notice of termination, Aternity never heard back from Leibowitz. The Court notes that one of the items in the notice of termination was: "You

will return all company property to the Westborough office."

On redirect examination, Matz again related the position of Aternity with regard to the future employment of Leibowitz.

Q.    Earlier this morning, Mr. Perlberg talked (sic) whether or not Aternity was

somehow stealing customers that Mr. Leibowitz brought to Aternity.

Does Aternity have any objection to Mr. Leibowitz selling

to those clients that he brought or made introductions outside of the

end-user experience space?

A.    Not at all.

Q.     Why is there no objection for him to take or to use those relationships

outside of the EUE space?

A.    The issue is not Mr. Leibowitz's relationship with those customers.  The

issue we have is with Mr. Leibowitz having our trade secrets in his

possession and using that with our primary and singular competitor on a

daily basis to compete with Aternity.

(Tr. at 244).

## B.  <u>The Plaintiff's Case in Opposition to the Motion for a Preliminary Injunction</u>

Mark Leibowitz testified that he is 45 years of age; was educated in the United States and in Japan; worked in Japan until 1998 when he returned to the United States; and has been in the software marketing industry, including financial services since 1993.  Leibowitz sold software to financial service companies.  His customer base included Chase, General Electric and Citigroup.  His prior position was with a company called GT Software in which he was a district sales

manager for the northeast.

At the end of December 2006, Leibowitz was in contact with Ira Cohen, who was then the CEO of Aternity with regard to working for that company. Leibowitz requested a base salary of $150,000 and commissions starting at 10%. Although the plaintiff testified that Cohen agreed to pay him the salary and commissions as described above, the actual January 25, 2007 employment offer, (Pltf's Ex. 1) was for a one year salary of $100,000 plus commissions of 10% on the first $1.5 million dollars of business. The offer was contingent upon his execution of the "Company's standard form of Confidential Information Agreement," a copy of which was enclosed. Leibowitz testified that he read the Confidential Information Agreement, discussed the terms with Cohen and signed it. Cohen told him that if he left the employ of Aternity he could take his customers with him.

Leibowitz started working for Aternity on February 7, 2007. Aternity was starting its business and their product was not in a sellable state at that point. He contacted many of his prior customers, and met face to face with 50 to 70 customers. However, he earned no commissions in 2007, because "[t]he product wasn't in a ready state to be sold." (Tr. at 290). The product was launched in January 2008, but could not be sold until March 2008.

In January 2008, Leibowitz was presented with a new compensation plan. His commissions were reduced from 10% to 5% although his salary was increased from $100,000 to $125,000. He was told by Matz to either sign the new plan or leave the company. In his view, that would mean he would have to leave his customers. Leibowitz testified that in 2008, only he and three other men were selling their products to the customers in the computer world. He continually protested about the amount of his commissions and was told by Matz and Jeanne

21

O'Byrne, the Vice President of Operations, that he was an uncooperative employee and that he needed to "toe the company line or leave." (Tr. at 302). Leibowitz testified that the total amount of commissions paid to him was the sum of $100,287.93.

Based on the percentages set forth in his original 2007 agreement, he would have been entitled to the sum of $349,460.36. However, there was an addendum to the compensation chart, namely there were deals that were in the process of closing when he was discharged which would have brought him additional commissions.

In April 2010, Leibowitz met with Matz. It was a very nasty meeting and Matz told him that it was time to part ways and he would pay him the commissions due from 2009 to 2010. Matz also told him that if he didn't agree to the company's mutually beneficial separation agreement he would make it difficult for Leibowitz to maintain a job in the software industry. Leibowitz declined to sign the separation agreement. In a conversation with Jeanne O'Byrne, she advised him to sign the separation agreement and she told him the names of a number of companies that he cannot work for including KNOA.

In his job search, Leibowitz reviewed the various companies that competed with Aternity. Leibowitz explained the circumstances leading to his employment with KNOA shortly after he left the Aternity employ. He found out that there was a position open at KNOA from Ira Cohen.

Leibowitz denied that he disclosed any of the pricing information from Aternity to KNOA. Further, he testified that KNOA could not use that pricing to compete unfairly against Aternity. Whereupon Leibowitz explained, in great detail, which consumed approximately ten pages in the record, why KNOA could not use the pricing information to compete unfairly against Aternity, and why knowledge of Aternity's pricing would not help KNOA in any way to

22

price its service contracts.  The Court is unconvinced.

The cross-examination of Leibowitz was instructive with regard to the factual determinations in this hearing.  It was emphasized, and the Court finds, that Leibowitz was an employee at will and could be terminated at any time for any reason.

> Q.      Is it fair to say, Mr. Leibowitz, that under the terms of the offer letter, you
>            were an employee at will?
>
> A.      Yes.
>
> Q.      And you could be terminated at any time for any reason?
>
> A.      Yes.

Further, Leibowitz signed off and committed to the 2008, 2009 and 2010 Compensation Plans, which set the terms of his salary and commissions.  He may have objected to some of the terms, but in the final analysis, he agreed in writing to both salary and commissions.  Nor did he ever express his concerns as to his commissions in writing until April 2010, at or about the time he was about to be terminated.

Leibowitz was questioned at length about the initial "Confidential Information, No Inconsistent Obligations and Invention Assignment Agreement" (Dfts' Ex. A), that he signed on January 25, 2007.  The answers to these questions provide relevant and material evidence in this application for a preliminary injunction.

> Q.      Now, at the time you began your employment with Aternity, you were
>            asked to sign a document entitled "Confidential Information, No
>            Inconsistent Obligations and Invention Assignment Agreement," correct?
>
> A.      Correct.

Q.     Let me ask you to take a look at what I believe to be Exhibit A.

A.     Uh-huh.

Q.     And is that the document, sir, that was referenced in the offer letter?

A.     Yes.

Q.     And was - - is it fair to say that you were required to sign this document as a condition of your employment?

A.     Yes.

Q.     Now, at the time you signed this document, I take it you read it?

A.     Yes.

Q.     You read it carefully?

A.     Yes.

Q.     You understood it?

A.     Yes.

Q.     And you had access to an attorney if you wanted an attorney to review it?

A.     Yes.

Q.     You would agree with me, would you not, sir, that these types of agreements are fairly standard in the technology world?

A.     In the U.S., yes.

Q.     And have you signed these types of agreements before?

A.     Couple of times.

Q.     And you understood that one of the purposes of this agreement was to protect confidential and proprietary information belonging to Aternity,

correct?

A.      Correct.

Q.      And by signing the agreement, you acknowledged that Aternity uses and

maintains trade secrets, correct?

A.      Correct.

                        *     *     *     *     *

Q.      Did you agree that upon your termination of employment with Aternity,

you would return all confidential information and copies thereof to the

company upon termination of your employment?

A.      Yes.

Q.      And did you return confidential information that you e-mailed yourself

that we talked about here, upon termination?

A.      No.

                        *     *     *     *     *

Q.      You would agree with me that your failure to return confidential

information that you e-mailed yourself violates the express terms of this

agreement?

A.      Under normal circumstances, yes.

                        *     *     *     *     *

Q.      Mr. Leibowitz, did you agree that any subsequent change or changes in

your duty, salary or compensation will not affect the validity or scope of

this agreement which is Exhibit A?

Did you agree to that?

A.  Yes.

Q.  And you also agreed that this agreement would be construed in accordance with the laws of Massachusetts; true?

A.  Yes.

*   *   *   *   *

Q.  Let me ask you to turn to page 7 of Exhibit A.

Would you turn to the second page, Provisions Necessary and Reasonable?

A.  Provision necessary and reasonable.  I agree that:

One.  The provisions of this agreement are necessary and reasonable to protect the company's confidential information, inventions and goodwill.

Two.  The specific temporal and geographical and substantive provisions set forth in section 3 are reasonable and necessary to protect the company's business interest.

Three.  In the event of any breach of any of the confidence set forth herein, the company would suffer substantial irreparable harm that would not have adequate remedy at law.

Q.  Did you agree to those provisions, Mr. Leibowitz?

A.  Yes.

Q.  And you read this agreement, correct?

A. Yes.

Q. And let me ask you another thing, Mr. Leibowitz.

Did you agree that in the event of a breach or threatened breach of any of these covenants, in addition to such other remedies that the company may have at law, without posting any bond or security, the company shall be entitled to seek and obtain equitable relief in the form of specific performance and/or temporary preliminary or permanent injunctive relief or any other equitable remedy which then may be available?

Did you agree to that, sir?

A. Yes.

(Tr. at 368-378).

There is no question that KNOA is a competitor of Aternity. Any doubt in this regard is dispelled by Leibowitz's own testimony.

Q. Mr. Leibowitz, is Knoa a competitor of Aternity?

A. Somewhat.

Q. Can you answer my question directly? Yes or no: Is Kona a competitor of Aternity?

A. Yes.

Q. And does it provide product in the end-user experience space?

A. Among other things.

Q. And were you advised during your employment with Aternity that Aternity

considered Knoa to be a competitor?

A.      Yes.

Q.      And indeed, Mr. Matz wrote to you on occasion and confirmed that, did he not?

A.      Yes.

Q.      And so you knew at the time you left the company that Knoa was a competitor?

A.      Yes.

Q.      And you knew it made some competing products, correct?

A.      Yes.

(Tr. at 378, 379).

Leibowitz testified that he first made contact with the KNOA company in March 2010, prior to his termination. At that time, he spoke to the president of KNOA, a man named Eidman. Prior to that, he had spoken to Ira Cohen on the last day of February 2010 or the first day of March 2010 regarding his potential employment at KNOA. At that first conversation with Eidman by telephone, Leibowitz advised him that he had an interest in joining KNOA. His next conversation with a KNOA representative was a "couple of weeks later." KNOA made him an offer of employment the last week of April 2010. However, the negotiation with a KNOA representative first commenced in the last week of March or early April. His first meeting with President Eidman was on or about Saturday, March 10, 2010 at a bar in a mall on Long Island. At that initial meeting, the men were getting to know each other leading to discussions about his employment with KNOA. Leibowitz met with Eidman a second time about two weeks later and a third time about another two weeks after that. As noted above, the offer of employment was made in the last week of April 2010.

Aternity presented substantial evidence with regard to its claims of trade secret and confidential information violations by Leibowitz, with regard to a series of e-mails from Leibowitz to his own home computer from January through April 2010. Among the documents and information that Leibowitz e-mailed to his home during the final days of his employment with Aternity, that Donna Parent found when she did a search of his computer after he left the company, in evidence as Dfts' Ex. F, were the following:

1.      January 25, 2010 – the Aternity 2010 Pricing Calculator.

2.      February 25, 2010 – the Aternity POC Insights; Frontline Message and Performance Analysis and Services.

3.      March 26, 2010 – the Aternity signed Contract and the Aternity License Agreement.

4.      April 9, 2010 – the Q2 Revenue Plan discussion with proposals and Pricing Calculators for the following customers and prospective accounts:

    Bank of America

    Merrill Lynch

    Cigna

    Paychex

    Sidley Austin

Significantly, some of these documents were e-mailed by Leibowitz to his home while he was having job discussions with KNOA.

Q.      So just to be clear, when you e-mailed what Donna Parent called a confidential document to yourself on March 26th, when you e-mailed that

to your home account, you were having job discussions with Knoa; true?

A.      Yes.

Q.      And of April 9th, while you were also having job discussions with Knoa,

you e-mailed yourself a number of other attachments, which is the next

page on Exhibit F, correct?

A.      I answered that earlier.

        MR. PARIS:        Move to strike, your Honor.

        THE COURT:        Motion granted.  Strike the answer as not being responsive.

        THE WITNESS:      Yes.

BY MR. PARIS:

Q.      "Yes" to my last question, Mr. Leibowitz?

A.      Yes.

Q.      So at the time that you were having discussions about going to work with

Aternity's competitor, you were e-mailing pricing calculators; true?

A.      Yes.

Q.      And you were e-mailing proposals to clients; true?

A.      Yes.

(Tr. at 385, 386).

    While Leibowitz returned the Aternity computers and printers back to the company, he

did not return the Aternity documents and property that he had e-mailed to himself.  He copied

them one month before his termination, probably while he was negotiating for employment with

KNOA, Aternity's major competitor.

30

Q. Did you return any of the attachments as part of Exhibit F when your employment with Aternity ended?

A. No.

Q. Did you return Exhibit 7 that you introduced at this trial when you were terminated - - let me ask you if you returned Exhibit 7, Competitive Landscape Overview. Did you return that to Aternity?

A. No.

Q. Did you return Exhibit 13, the strategic messaging document, when you left Aternity?

A. No.

Q. By the way, do you have other documents in your possession that are Aternity materials that you haven't introduced into evidence in this case?

A. Turned everything over to my attorneys.

\* \* \* \* \*

Q. Let's me ask you this question: Before April 9th and while you were negotiating with Knoa to go to work for Aternity's competitor, did you access, download, copy, e-mail or otherwise take Aternity property that you had not thus far returned?

A. Don't know how to answer.

Q. You don't know how to answer that question.

Was that your answer?

A. That is my answer.

*    *    *    *    *

Q.      Did you - - we've already established you've e-mailed some documents to

yourself during the time you were negotiating with Knoa.

Are there other documents that your lawyers have that you

e-mailed to yourself prior - - strike that - - during the time you were

in negotiations with Knoa?

A.      Possibly.

(Tr. at 387, 388, 390, 391).

As an example of what Leibowitz was receiving from Aternity at the same time he was

negotiating for employment as a salesman with KNOA, on March 22, 2010, Parent sent him and

the other Aternity sales persons an e-mail (Dfts' Ex. X).  This e-mail forwarded to Leibowitz the

Aternity marketing inbound leads, which he thereafter e-mailed to himself.

In his own behalf, Leibowitz testified that he has no intention of disclosing any

confidential information to KNOA.  He would consider such an act to be "highly unethical."  He

explained that he was hired by KNOA because of his skills and reputation and "not to bring

information from Aternity to KNOA."  (Tr. at 425).  He also stated that while he was

interviewing with KNOA prior to being fired, he was not yet offered a job.

The Court notes the statement in the Leibowitz April 11, 2008 e-mail to Matz, "I got

some very good G2 on KNOA this morning from a friend of mine who worked with me at GT

Software who joined KNOA last week."  (Dfts' Ex. J).  It is revealing that as far back as April

2008, information regarding KNOA was described as G2, which is the code for military

intelligence during World War II.  Of importance, this e-mail also revealed that Leibowitz had

information that could be used against Aternity.  The testimony of Leibowitz with regard to the intense competition between Aternity and KNOA is compelling and convincing and will be recorded in this decision, in part, as follows:

> Q.    And you made it a point, did you not, to tell Mr. Matz that you didn't give any information that could be used against Aternity?  Correct?
>
> A.    Correct.
>
> Q.    So at that time you had information that could be used against Aternity; true?
>
> A.    True.
>
>          *    *    *    *    *    *
>
> Q.    Is it fair to say that Mr. Matz was acknowledging this very good intelligence, or G2, on Knoa that you forwarded him?
>
> A.    Correct.
>
> Q.    And he thanked you for that intelligence on Knoa; right?
>
> A.    Correct.
>
> Q.    And the first thing he told you after you forwarded this intelligence on Knoa is, Knoa is definitely the competition to watch; right?
>
> A.    As stated.
>
> Q.    And so as of April 11th, not only were you seeking information on Knoa but your boss, the CEO of the company, as early as April of 2008, told you specifically that Knoa was the competition to watch; correct?
>
> A.    Correct.
>
> Q.    And then you respond to Mr. Matz further and you say: One other good

point.  If they start selling prospect - -

When you used the word "they" there, were you referring to Knoa?

A.    Yes.

Q.    So you wanted to respond to Mr. Matz and give him further ideas about Knoa?

A.    Right.

Q.    And that was Knoa, the competition to watch, as your CEO told you; correct?

A.    Yes.

Q.    And the first page of Exhibit J is an e-mail from November of 2008; correct?

A.    Correct.

Q.    And that's an e-mail from you to Mr. Matz; is that right?

A.    Correct.

Q.    And in that e-mail, you point out that Knoa has four pharma accounts, or pharmaceutical accounts; correct?

A.    Correct.

Q.    And your message to Mr. Matz about these pharmaceutical accounts was: I will do my best to get them unseated, and then there's a smiley face.

Did I read that correctly?

A.    Right.

Q.    Meaning that you wanted to get these customers from Knoa for Aternity; true?

A.    True.

(Tr. at 456, 458, 459).

Finally, in his testimony, while Leibowitz declined to concede that if this injunction was granted and he was precluded from selling KNOA software, he could still sell other types of software to all of the relationships that he had when he came to Aternity, it is apparent that this request for an injunction, if granted, could not prevent him from selling software to all of his prior customers.

The proof is clear and convincing that Leibowitz was aware that KNOA was a principal if not the main Aternity competitor. On December 2, 2009, Matz e-mailed the sales force. One subject was "KNOA – CONFIDENTIAL" and he stated that "the EUE market is a two horse race with Aternity and KNOA." The e-mail stated, in part:

From:       Trevor Matz
Sent:       Wednesday, December 02, 2009   3:56 PM
To:         Marcus Brown; Mark Leibowitz; Jeffrey Parillo; Paul Jones; Pryce Harrison
Subject:    Re:  Knoa – CONFIDENTIAL

Hi Team USA –

We've received some interesting news from two separate analyst sources indicating that Knoa is no fairing so well.

Today, I spoke with leading Forester APM analyst, JP Garbanni.  He said that the EUE market is a two horse race with Aternity and Knoa.  He then made a blanket statement that Knoa is "in trouble".  He spoke with them a week or so ago and they seemed "confused as to where to go from here."  He's working on a Market Update report this month on the end user experience management space and Aternity (and Knoa) will be featured in his research.
Yesterday, Donna met with our Gartner AM and she shared some statistics around what Gartner's end user clients are searching on.  We were able to extract details on the difference in searches between Aternity and Knoa – highlights include:

1.    On the Gartner.com research site, Aternity has been searched for by Gartner clients 57 percent more times that Knoa

2.    In terms of the size of the organizations searching on Aternity versus Knoa, Aternity received 288 percent more searches from large enterprises than Knoa

The combination of these two independent analyst firms confirms that Knoa's lifeline seems to be running out, or at least running low on gas.

PLEASE DO NOT FORWARD THIS EMAIL TO ANYONE AND DO NOT QUOTE ANY OF THE ABOVE TO ANYONE OUTSIDE THE COMPANY.

Best
Trevor

(Dfts' Ex. K).  (emphasis supplied).

On December 2, 2009, Leibowitz responded to this e-mail regarding the "Subject: Knoa - Confidential":

From:           Mark Leibowitz
Sent:           Wednesday, December 02, 2009     4:41 PM
To:             Trevor Matz; Marcus Brown; Jeffrey Parillo; Paul Jones; Pryce Harrison
Cc:             Donna Parent; Jeanne O'Byrne
Subject:        RE: Knoa - - CONFIDENTIAL

I would recommend a campaign targeting their customers offering them a deep discount for switching to Aternity.  Their customer base is pretty much listed on their website.

## II.  THE PARTIES CONTENTIONS

### A.  Defendant Aternity Contentions

Aternity contends that it is an industry-leading technology company in the EUE market. In particular, Aternity develops and licenses software designed to help Information Technology companies monitor their desktop performance and user productivity.  Aternity's product is designed to transform every desktop into a self-monitoring platform that dramatically reduces business disruptions and increases user production.  It provides preemptive problem detection, cause analysis and support capabilities, providing the companies who use their technology "with a path of constant improvement."  Aternity markets its software to Global 1000 and Fortune 500 companies.  It is an expensive software operation.  Typical sales contracts with these customers

range from $250,000 to more than $1 million.

The EUE market is a highly specialized market with two undisputed competitors, Aternity and KNOA. The analyst firm Forester Research results stated that there are "only two major desktop monitoring specialists: Aternity and KNOA software." Aternity and KNOA regularly compete head-to-head in major transactions in the EUE market.

Leibowitz began working for Aternity on February 7, 2007 as a Regional Account Manager. He was trained in all aspects of Aternity's product, sales, marketing and business strategies, including specific information on how to compete against KNOA. Leibowitz obtained detailed knowledge about Aternity's product, strategies, and plans. He was trusted with the Aternity trade secrets. Because of his access to Aternity's trade secrets and confidential information, Leibowitz was requested to execute Aternity's "Confidential Information, No Inconsistent Obligations and Inventions Assignment Agreement" ("the Agreement"). By signing this Agreement, Leibowitz expressly acknowledged that Aternity was going to entrust him with its trade secrets and confidential information, and he agreed never to disclose that information to anyone. The Agreement specifically provides that Aternity "developed, uses and maintains trade secrets and other confidential and proprietary information." He agreed that all such confidential information shall remain the sole property of Aternity and he will not disclose any of their confidential information.

Further; in order to protect Aternity's trade secrets and confidential information, Leibowitz also agreed not to work for any of Aternity's competition for a period of one year, in the following specific language:

twelve (12) months thereafter, I may not (whether as an employee, agent, servant, owner, partner, consultant, independent contractor or representative, stockholder or in any other capacity whatsoever) perform work on behalf of any person (including myself) or entity, other than the Company, that is competitive with any service or product offered or under development by the Company at any time during the one-year period preceding the termination of my relationship with the Company, or otherwise directly or indirectly compete with the products or services of the Company in the fields of system availability and performance management tools which perform early discovery of IT infrastructure problems and automated root cause analysis of such problems from an end user perspective, . . . without the express prior written consent of the Chairman of the Company.

Leibowitz further expressly agreed that his obligations to Aternity were reasonable and necessary to protect Aternity's trade secrets and confidential information and that Aternity would be irreparably harmed if he breached the Agreement.

Aternity further alleges that after Leibowitz was terminated, he contacted Aternity's customers, third-party vendors and current employees and "began making false allegations and disparaging remarks about Aternity and its officers in violation of the non-disparagement provision of the Agreement."

On May 17, 2010, Aternity received a letter from KNOA stating that it had hired Leibowitz as its Director of Global Sales, Financial Services and Telecommunications which, according to Aternity is essentially the same position he had with Aternity. Also, according to Aternity, Leibowitz has already contacted at least three Aternity customers, whose accounts he managed while at Aternity.

For all these reasons, Aternity contends that it has established threatened and actual irreparable harm and that Leibowitz will inevitably use and disclose Aternity trade secrets and

confidential information, in performing his duties with KNOA, its major competitor. Aternity requests a preliminary injunction granting the relief initially requested.

## B. **Plaintiff Leibowitz Contentions**

The plaintiff Mark Leibowitz contends that his initial employment agreement with Aternity provided that he would receive 10% commission on sales up to $1,500,000; 12% on sales between $1,500,001 and $2,000,000; and 15% on sales above $2,000,000. He was told that the Aternity software was market ready when it was not. The software did not become available until March, 2008. On January 21, 2008, under protest, the plaintiff signed the second employment agreement. His salary was increased to $125,000, but his commissions were reduced to 5% on the first $2,500,000 and 8% to 10% on sales above that amount. On December 17, 2008, again under duress and protest, the plaintiff signed the 2009 Compensation Plan. His salary remained the same but the commissions were once again reduced; this time from 2.6% to 5.6%. Finally, on January 7, 2010, again under duress and protest, the plaintiff signed the 2010 Compensation Plan. Again, the salary of $125,000 was the same but the commissions were 2.5% to 7.09%.

Matz terminated the plaintiff's employment on April 16, 2010, effective May 14, 2010. The plaintiff then went to work for KNOA. On May 18, 2010, the plaintiff commenced this action to receive the balance of his commissions and other relief. On May 14, 2010, KNOA's President Thad G. Eidman wrote to Matz, advising him that the plaintiff would abide by the terms of the Non-Compete Agreement.

The plaintiff contends that Aternity's application for a preliminary injunction must be denied for the following reasons:

1.   The Non-Compete Agreement cannot be enforced because the defendants materially breached the plaintiff's initial employment agreement by forcing him to sign subsequent agreements that covered his salary and commissions.

2.   The Non-Compete Agreement cannot be enforced because Aternity made material changes in the terms and conditions of the plaintiff's employment without securing a new Non-Compete Agreement.

3.   The Non-Compete Agreement should not be enforced because it is overly broad, unreasonable, not supported by adequate consideration and violates public policy.

4.   Aternity has not demonstrated a likelihood of success on the merits for the three reasons stated above; Aternity has not demonstrated the likelihood of irreparable harm; equitable relief should be denied based on the doctrine of unclear hand because the defendants breached the employment contract and refused to pay the plaintiff all the commissions he earned; the defendants violated the New York State Labor Law by failing to timely pay all the plaintiff's commissions, and by violating the New York Human Rights Law by discriminating against the plaintiff based upon his religion.

5.   The defendants are not entitled to a preliminary injunction until they post a bond as is required by Rule 65(c) of the Federal Rules of Civil Procedure.  A reasonable bond would be in an amount of $5,000,000.

### III.  <u>DISCUSSION</u>

#### A.  <u>The Choice of Law Provision and the Applicable Law</u>

Here, the Agreement contains a Massachusetts choice of law provision.  (The Agreement at ¶ 6[b]).  As a general rule, choice of law provisions are valid and enforceable in New York.

Accordingly, the enforceability of the non-compete provisions in the Agreement is governed by Massachusetts law. The Court finds that the rules of law in Massachusetts and New York regarding injunctive relief for trade secrets are substantially similar. In fact, the parties' memoranda of law assume that New York law "is in accord" with Massachusetts law (Dfts' Memoranda at p. 11) and "the issue of whether this court should grant a preliminary injunction is a question of federal procedural law . . . Therefore; the standards set forth in the decisions of the Second Circuit are controlling." (Pltf's Memorandum of Law at p. 10).

**B.  The Requests for Relief**

The defendant Aternity has moved to enjoin Leibowitz from (1) working for Aternity's principal competitor KNOA, Software, Inc. for a period of one year, namely from May 10, 2010 through May 11, 2011, (2) soliciting any business from any existing or prospective customer of Aternity that is competitive with any service or product offered or under development by Aternity for that one year period, (3) using or disclosing any Confidential Information, as defined in paragraph 3 of the Agreement, (4) using or disclosing the Aternity Trade Secrets, and (5) disparaging Aternity and its officers, directors, shareholders, and employees.

**C.  The Legal Standards – Preliminary Injunctions**

It is well-established in the Second Circuit that a party seeking a preliminary injunction must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 25 (2d Cir. 2010) (citations omitted).

1. **Irreparable Harm**

Aternity contends that it will be irreparably harmed in the absence of an injunction because Leibowitz will inevitably use or disclose confidential information and trade secrets while working for KNOA. Leibowitz counters that the harm envisioned by Aternity is speculative.

The Second Circuit has emphasized that the irreparable harm requirement is "the single most important prerequisite for the issuance of a preliminary injunction." Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999). "Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages." Reuters Ltd. v. United Press Intern., Inc., 903 F.2d 904, 907 (2d Cir. 1990) (internal citations omitted). Here, Aternity has no difficulty in meeting this burden.

Based upon the evidence presented at the hearing, it is clear that Leibowitz is either in possession of or has knowledge of various forms of Aternity confidential information and trade secrets. Aternity witnesses testified that during his tenure with the company, Leibowitz was entrusted with technical and confidential information about Aternity products and product development. It was also revealed that Leibowitz had access to confidential customer contact and pricing information as well as Aternity's marketing plans. Before he left Aternity, and knowing he was leaving, Leibowitz e-mailed various confidential documents and trade secrets to his personal address including: Aternity's 2010 Price Calculator; Aternity's Licensing Agreements for certain customers; so-called Proof of Concept Insights that were presented to customers; and confidential lists of prospective customers.

In the Court's view, it is inevitable that Leibowitz would either disclose or make use of

this information during the course of his employment at KNOA, if he has not done so already.

See Marcam Corp. v. Orchard, 995 F. Supp. 294, 297 (D.Mass. 1995) (finding irreparable harm, despite ex-employee's promise not to disclose confidential information, because it was "difficult to conceive how all of the information stored in [the employee's] memory can be set aside as he applies himself to a competitor's business and its products."). Indeed, Leibowitz explicitly acknowledged as much by signing the Non-Compete Agreement, which provides that "if [an employee] become[s] employed or affiliated with any competitor . . . it is inevitable that [the employee] would disclose [Aternity's] Confidential Information to such competitor." There is no serious question that the disclosure or use of this information would give KNOA, the major Aternity competitor, an unfair advantage in the niche EUE marketplace. It is also clear that Aternity would be irreparably harmed if Leibowitz used this information to gain an advantage in soliciting Aternity customers or to disparage the company and its officers. Under the circumstances, Aternity has clearly established that it would be irreparably harmed in the absence of the requested injunctive relief.

### 2. Likelihood of Success on the Merits

Aternity contends that it is entitled to an injunction because it is likely to succeed in proving that the Non-Compete Agreement is reasonable and enforceable. Aternity also maintains it is entitled to an injunction under the Massachusetts Trade Secrets Act, M.G.L. c.93 § 42A. The Court will address the merits of these claims in turn.

### a. The Plaintiff is an Employee at Will

There is no doubt that the plaintiff was an employee at will in his sales position at Aternity. He admitted this in his testimony. Under either New York or Massachusetts law, an

employee at will could be terminated at any time and for any non-discriminatory reason. As stated in <u>Jackson v. Action For Boston Community Development, Inc.</u>, 403 Mass. 8, 525 N.E.2d 411 (1988), "[e]mployment at Will is terminable by either the employee or the employer without notice, for almost any reason for no reason at all." <u>See</u> <u>Cort v. Bristol-Meyer Co.</u>, 385 Mass. 300, 305, 431 N.E.2d 908 (1982).

**b. Whether the Non-Compete Agreement is Enforceable Under Massachusetts Law**

Leibowitz claims that Aternity committed a material breach of his initial offer letter and that Aternity's breach relieved him of the obligation to abide by the non-compete agreement. In particular, Leibowitz argues that Aternity breached the 2007 offer letter by "forcing him to sign subsequent agreements that lowered his salary and commissions . . ." Pl. Br. at 8. However, Section 6(e) of the Non-Compete Agreement provides that "[a]ny subsequent change or changes in [Leibowitz's] duties, salary or compensation will not affect the validity or scope of this Agreement." Therefore, under the plain terms of the contract, Leibowitz's obligation to honor the Non-Compete was unaffected by the revised agreements.

Furthermore, there is no indication that Aternity actually "breached" Leibowitz's initial offer letter. Leibowitz signed a new "Compensation Plan" in 2008 and again in 2009 and 2010. It is undisputed that these revised agreements changed his compensation structure, sales quota, and sales territory. However, it is difficult to perceive – and Leibowitz makes no convincing effort to explain – how he could agree to these revised agreements, sign the agreements and accept compensation under the agreements and now contend that the new agreements effectively breached the initial offer letter.

Leibowitz contends that he was forced to sign the new agreements under "economic

duress", but this argument in unavailing.  It is settled law in Massachusetts that "[a] party must complain *promptly* of coercive acts that allegedly forced it into the contract or the defense of duress is waived, and the contract ratified."  Cabot Corp. v. AVX Corp., 448 Mass. 629, 642-43, 863 N.E.2d 503 (Mass. 2007) (emphasis added); see Beaconsfield Townhouse Condominium Trust v. Zussman, 49 Mass. App. Ct. 757, 733 N.E.2d 141 (2000) (observing that "[s]ilence, acquiescence, or performance of the contract are among the ways in which the defense of duress is waived . . .").  Here, Leibowitz entered into the revised agreements on January 21, 2008, December 17, 2008, and December 28, 2009.  He signed all of the agreements.  He continued to perform under these revised agreements until he was terminated and only formally raised the duress argument for the first time in connection with Aternity's instant motion.  Under the circumstances, the Court finds that Leibowitz waived the defense of duress.  See American Stop Loss Ins. Brokerage Servs. Inc. v. Prince, No. 01-0215, 2001 WL 173178 (Mass. Super. Feb. 14, 2001) (rejecting employee's claim that employer's changes to his commission structure left employer with "unclean hands" because employee accepted the commissions and continued to work at the company).

Next, Leibowitz contends that the Non-Compete Agreement became inoperative when Aternity made material changes to his employment.  "Under Massachusetts law, '[e]ach time an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship a new restrictive covenant must be signed."  Astro-Med, Inc. v. Nihon Kohden America, Inc., 591 F.3d 1, 16 (1st Cir. 2009) (quoting Lycos, Inc. v. Jackson, No. 2004-3009, 2004 WL 2341335 (Mass. Super. Ct. Aug. 24, 2004)).  This rule was first set forth in F.A. Bartlett Tree Expert Co. v. Barrington, 353 Mass. 585, 233 N.E.2d 756

(1968) ("FA Bartlett").

After FA Bartlett, Massachusetts courts have applied this rule where "the conduct of the parties clearly showed that they had abandoned and rescinded by mutual consent the earlier employment agreement containing the pertinent non-compete provision and had entered into a new employment relationship that included no such non-compete provision." Intertek Testing Servs. N.A., Inc. v. Curtis-Strauss LLC, No. 98-903-F, 2000 WL 1473126, at *6 (Mass. Super. Ct. Aug. 8, 2000). "In determining whether there has been a material change to the employment relationship, courts have considered it extremely significant that the employer sought to have the employee sign a new non-compete agreement." Iron Mountain Information Mgm't, Inc. v. Taddeo, 455 F. Supp. 2d 124, 132 (E.D.N.Y. 2006) (interpreting Massachusetts law).

Here, there is no indication that the parties abandoned the non-compete provision when they entered into the revised Compensation Plans. Significantly, after reaching new agreements with Leibowitz in three separate years, Aternity never sought to have Leibowitz sign a new Non-Compete Agreement. As noted above, there was no need for Leibowitz to sign a new Non-Compete Agreement because Section 6(e) of the existing agreement provides that "[a]ny subsequent change or changes in [Leibowitz's] duties, salary or compensation will not affect the validity or scope of this Agreement." In light of Section 6(e), the Court finds that the changes to Leibowitz's compensation, sales quota, and sales territory did not require the parties to execute a new Non-Compete Agreement.

Leibowitz also contends, in conclusory fashion, that the Non-Compete Agreement is unreasonable. In Massachusetts, "[a]n employer may enforce the terms of a non-competition agreement with a former employee when it demonstrates that the agreement: (a) is necessary to

46

protect a legitimate business interest of the employer; (b) is supported by consideration; (c) is reasonably limited in all circumstances including time and space; and (d) is otherwise consonant with public policy." Stone Legal Resources Group, Inc. v. Glebus, No. CA025136, 2003 WL 914994, at *3 (Mass. Sup. Ct. Feb. 2003) (citing Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 102-03 (1979)).

Here, Leibowitz does not appear to dispute that the Non-Compete Agreement was designed to protect a legitimate business interest. He does maintain that the Non-Compete Agreement was without adequate consideration. However, it is well-established that where, as here, "a non-competition provision is signed at the beginning of employment there is sufficient consideration." Stone, 2003 WL 914994, at *5 (citing Slade Gorton & Co. v. O'Neil, 355 Mass. 4, 9 (1968)). In this case, Leibowitz signed the non-competition provision on January 25, 2007, the same day he received the initial offer letter.

Although Leibowitz does not challenge the one-year duration or geographic scope of the Non-Compete Agreement, he does complain of its breadth insofar as it prevents him from soliciting existing or prospective Aternity customers. In determining whether the scope of a non-compete is reasonable, courts in Massachusetts "consider the nature of the business and the character of the employment involved, as well as the situation of the parties, the necessity of the restriction for the protection of the employer's business and the right of the employee to work and earn a livelihood." Stone, 2003 WL 914994, at *5 (quoting Richmond Bros., Inc. v. Westinghouse Broad. Co., Inc., 357 Mass. 106, 109 (1970)).

Here, there is no question that the restrictions the Non-Compete Agreement places on Leibowitz are necessary to protect Aternity's business. The evidence at the hearing clearly

showed that Leibowitz is in possession of Aternity's customer contact lists, pricing information and trade secrets. If he is permitted to work for KNOA, Aternity's principal competitor, it is inevitable that he will use this information to solicit current and prospective Aternity customers.

On the other hand, an injunction that prevented Leibowitz from soliciting "prospective" Aternity customers would be quite broad. The Non-Compete Agreement defines "prospective customers" to include "all person and entities to whom [Aternity] has made efforts to sell products or services." By precluding Leibowitz from contacting existing *and* prospective Aternity customers, the injunction would likely prevent him from working in the EUE field for the next year.

Nevertheless, on balance, the Court finds that the proposed injunction is reasonable in its scope. If Leibowitz is able to use the confidential list of prospective customers to solicit their business, he could seriously hinder Aternity's business development. When considered alongside the fact that he has confidential knowledge about Aternity's pricing information and product weaknesses, it is clear that by allowing him to solicit existing and prospective customers, he could completely undercut Aternity.

In sum, the Court finds that the Non-Compete Agreement is enforceable under Massachusetts law because it is reasonable in scope, duration, and geographical limitation.

### c. The Massachusetts Trade Secrets Act

The Massachusetts Trade Secrets Act, M.G.L. c.93 § 42A, provides that "[i]n an action by an employer against a former employee . . . for the conversion of a trade secret and where such conversion is in violation of the terms of a written employment agreement between said employer and employee," the employer will be entitled to a preliminary injunction if it can show

48

that the "employee is working in a directly competitive capacity with his former employer in violation of the terms of such agreement and that in violation of the terms of such agreement said employee has used such trade secret in such competition." M.G.L. c.93 § 42A. The first issue to be determined is whether under Massachusetts law the information Aternity seeks to protect can be viewed as trade secrets.

Trade secrets include anything tangible or intangible that constitutes secret production or management information. Massachusetts General Law, Chap. 266 § 30. Under Massachusetts law, a trade secret is defined rather broadly to include "anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement." M.G.L. 266 § 30. In deciding whether information qualifies as a trade secret, Massachusetts courts evaluate: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." <u>Jet Spray Cooler, Inc. v. Crampton</u>, 361 Mass. 835, 840, 282 N.E.2d 921 (Mass. 1972).

The evidence at the hearing, related in detail above, clearly established all of the elements of a trade secret as to (1) Aternity's confidential customer contacts; (2) Aternity's pricing information; (3) technical information about Aternity's products, product development and future

product releases; and (4) Aternity's competitive strategies and strategic future planning.

Further, the Court finds that Aternity has taken the required reasonable steps to ensure that this information remains confidential by, among other acts, requiring its sales force to sign Non-Compete Agreements, Confidential Covenants, and creating and enforcing valid and binding Non-Disclosure Policies.  See Data General Corp. v. Grumman System Support Corp., 825 F.Supp. 340 (D. Mass. 1993) (pointing to confidential agreements from employees as a significant step in preserving confidential information).

### d.  The Non-Disparagement Request

As an added feature to its request for preliminary injunctive relief the plaintiff requests that the Court enjoin Leibowitz from "disparaging Aternity and its officers, directors, shareholders and employees."  Neither party seems to have paid too much attention to this request, because it was not commented on in the three briefs submitted.  This request by Aternity is, again, based on the language of the Non-Compete Agreement.  At paragraph 3(e), it is stated:

> (e)  While employed with the Company and at all times thereafter,
> I will not make any statement that is professionally or personally
> disparaging about, or adverse to, the interests of the Company, any
> of its officers, directors, shareholders or employees including, but
> not limited to, any statement that disparages any person, product,
> service, financing, financial condition, capability or other aspect of
> the business of the Company or any of its officers, directors,
> shareholders or employees.

This is a troubling concept.  It purports to ensure that Leibowitz will not make any statement that is "professionally or personally disparaging about, or adverse to the interests of the company; any of its officers, directors, shareholders or employees" and is practically unlimited in scope.  Such a source of injunctive relief would be a fertile field for future interpretation and

litigation. In the Court's view this form of injunctive relief is of necessity, ambiguous; and it is denied.

## IV. CONCLUSIONS

Based on the evidence at the hearing and the law as reviewed by this Court, Aternity, Inc. has established, by clear and convincing evidence, that it is entitled to a preliminary injunction. Therefore, the motion by the defendant Aternity, Inc. for a preliminary injunction is hereby granted, on the following terms:

1. Leibowitz is enjoined for working for KNOA Software Inc. for a period of one year, commencing on July 19, 2010 and ending on July 15, 2011.

2. Leibowitz is enjoined from soliciting any business from any existing or prospective customers of Aternity in which such solicitation is competitive with any services or product offered by Aternity, for a period of one year, commencing on July 16, 2010 and ending on July 15, 2011.

3. Leibowitz is enjoined from using or disclosing any Confidential Information as defined in paragraph 3 of the Non-Disclosure Agreement signed by Leibowitz on January 25, 2007.

4. Leibowitz is enjoined from using or disclosing the Aternity Trade Secrets, as that term is defined in this decision.

## V. IS SECURITY REQUIRED?

Under the federal rules, there is provision for the issuance of security, in the form of a bond, where a preliminary injunction of this kind is directed. Federal Rules of Civil Procedure 65(c), provides:

> (c) **Security**.  The court may issue a preliminary injunction or a
> temporary restraining order only if the movant gives security in an
> amount that the court considers proper to pay the costs and
> damages sustained by any party found to have been wrongfully
> enjoined or restrained.  The United States, its officers, and its
> agencies are not required to give security.

The Non-Compete Agreement seems to eliminate the requirement of security, at

paragraph 4 which provides:

> In recognition of the foregoing, I agree that in the event of a breach
> or threatened breach of any of these covenants, in addition to such
> other remedies as the Company may have at law, <u>without posting
> any bond or security</u>, the Company shall be entitled to seek and
> obtain equitable relief, in the form of specific performance, and/or
> temporary, preliminary or permanent injunctive relief, or any other
> equitable remedy which then may be available.

(emphasis supplied).

There is some authority that such immunity clauses should not supercede the Rule 65(c)

protective bond provision.  <u>Traders Intern., Ltd. v. Scheuermann</u>, No. H-06-1632, 2006 WL

2521336, at *10 (S.D. Tex. Aug. 30, 2006); <u>Uncle B's Bakery, Inc. v. O'Rourke</u>, 920 F.Supp.

1405, 1439 (N.D. Iowa 1996).

In the Court's view, this is one case where it would be far the better course to require a

bond.  Here, the Court is preventing the plaintiff from working for KNOA, his present employer,

for a period of one year and preventing him from soliciting business from existing or prospective

customers of Aternity for a period of one year and other restrictions.  Counsel for the plaintiff is

correct in advising the Court that Leibowitz may be deprived of his livelihood for one year and

he may lose professional contacts that he developed over the last number of years.  However, the

evidence revealed that the plaintiff has prior customers who he can service without restraints and

he may be able to obtain another position.

This is a court of equity granting equitable relief. In the event it is determined that Leibowitz was wrongfully enjoined, he should have a compensatory recourse. Accordingly, the Court directs that the defendant Aternity Inc. is directed to obtain and file a bond as security in the sum of $250,000 within ten (10) days of the date of this decision and order.

**SO ORDERED.**

Dated: Central Islip, New York
       July 14, 2010

_/s/ Arthur D. Spatt_
ARTHUR D. SPATT
United States District Judge